## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 23-cr-368 (TNM)** |
| **JUSTIN LEE,** | |
| **Defendant.** | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that the Court sentence Justin Lee to 68 months of incarceration, three years of supervised release, $2,000 in restitution, and the mandatory special assessment of $260.

## I.    INTRODUCTION

The defendant, Justin Lee, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

Lee was in the first wave of protestors who breached the restricted perimeter along the

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

West Front of the U.S. Capitol. After climbing over a stone retaining wall and snow fencing, and helping other rioters do the same, Lee took an Area Closed sign that had been posted on the snow fencing and moved toward the Maryland Walkway, carrying away his memento. Lee spent the next 90 minutes on the West Plaza, where he watched the police line stationed there fall, before climbing to the top of the scaffolding south of the Inaugural Stage. After pausing on the scaffolding to review the mob of rioters below, Lee next moved to the bleachers, then down to the mouth of the Lower West Terrace Tunnel (the "Tunnel"), where rioters were fighting against police in an attempt to enter the Capitol Building. At 4:46 p.m., Lee lit and threw a smoke bomb at the police line in the Tunnel, which hit Metropolitan Police Department ("MPD") Officer J. S.'s shield, then spewed smoke in other officers' faces and throughout the Tunnel. Lee proceeded to throw three other unknown objects at the police line, before pulling out a flashlight and light-checking the police.

The government recommends that the Court sentence Lee to 68 months of incarceration for violating, amongst other counts of conviction, 18 U.S.C. §§ 111(a)(1) and 231(a)(3). A 68-month sentence reflects the gravity of Lee's conduct, his false testimony, and lack of remorse.

## II.    FACTUAL BACKGROUND

### A.    The January 6, 2021 Attack on the Capitol

The government refers the court to the Stipulations agreed to by the parties and the testimony of U.S. Capitol Police Lieutenant Shawn Walton for a short summary of the January 6, 2021, attack on the United States Capitol by hundreds of rioters, in an effort to disrupt the peaceful transfer of power after the November 3, 2020 presidential election. Aug. 20, 2024 Trial Tr. at 9:14-90:8.

**B.    Lee's Role in the January 6, 2021 Attack on the Capitol**

On January 6, 2021, Justin Lee travelled from his home in Rockville, MD to Washington, D.C., to attend the Stop the Steal Rally.  As the rally wound down, Lee joined the crowds moving east along Constitution Avenue and walked toward the U.S. Capitol.



*Image 1:  Lee (circled in yellow) moving east along Constitution Avenue toward the Capitol Building (Ex. 801)*

Lee reached the West Front of the restricted Capitol grounds just after 12:50 p.m., right as the first rioters breached the restricted perimeter by the Peace Circle.  Lee positioned himself at the Olmsted wall south of the Peace Monument, directly in front of a row of intact snow fencing bearing Area Closed signs.



*Image 2: Lee (yellow circle) standing on the Olmsted wall in front of snow fencing, filming the growing crowd around him (Ex. 502 at 0:23)*

Despite clearly seeing the snow fencing and Area Closed signs, Lee climbed up the Olmsted Wall, and after filming the scene around him, stepped over the fencing, entering the restricted Capitol perimeter. Lee then waved his arms at the crowd, encouraging them to join him, and assisted other rioters climbing over the wall and snow fencing.



*Image 3: Lee (yellow circle) helping other rioters climb into the restricted perimeter (Ex. 503 at 1:12)*

After helping other rioters breach the restricted perimeter, Lee next moved east to the Maryland Walkway, carrying away one of the Area Closed signs which had been attached to snow

fencing with him.  Image 4, below, shows Lee carrying the Area Closed sign at approximately

1:10 p.m., after he turned around and moved back west along the Maryland Walkway.



*Image 4:  Lee (yellow circle) carrying a U.S. Capitol Police Area Closed sign with him on the
Maryland Walkway (Ex. 504B)*

As Image 4 shows, at this point in the day, Lee wore a dark puffer jacket, khaki pants, a

crossbody backpack, and a surgical mask.  In his backpack, Lee brought a flashlight, water,

medical equipment, tourniquets, bandages, and anticoagulants because, as he testified at trial, he

had seen people sustain injuries at prior protests, and wanted to be prepared for violence which he

believed might occur on January 6.  Aug. 21, 2024 Trial Tr. at 37:4-20, 85:19-86:8.

From the Maryland walkway, Lee next moved to the Lower West Plaza and stood on the

half wall, where he saw U.S. Capitol Police and Metropolitan Police Department Officers form a

police line to try and stop rioters from pushing closer to the Capitol building.  During Lee's time

on the West Plaza, which he described as "grim," he saw rioters assault police officers numerous

times as they tried to break through the line.  *Id.* at 60:5-6.  Lee also witnessed officers deploy

chemical munitions to disperse the mob.  But despite witnessing this ongoing chaos and violence,

at one point, Lee jumped up and down on the half wall, waving and cheering in excitement.



*Image 5:  Lee (yellow circle) cheering while standing on the half wall at the Lower West Plaza (Ex. 506 at 2:46)*

After spending approximately 90 minutes on the Lower West Plaza, Lee made his to the temporary scaffolding erected to the south of the Inaugural Stage and climbed to the top of the scaffolding.  At approximately 2:55 p.m., after the police line defending the Lower West Plaza fell, Lee stood on top of the scaffolding and observed the melee below him.



*Image 6:  Lee (yellow circle) standing on top of the scaffolding (Ex. 802)*

As Image 6 shows, at the top of the scaffolding, Lee now wore a military-style tactical bag on the front of his body.  Lee testified that this was the type of tactical pouch people use to carry ammunition.  Aug. 21, 2024 Trial Tr. at 39:2-3, 21-25.

From his position on the scaffolding, Lee could see rioters on the Lower West Terrace and in the Lower West Terrace Tunnel (the "Tunnel").  The Tunnel is where some of the worst violence on January 6 occurred, and through conversations he had with other rioters, Lee testified that he was aware that rioters and officers were fighting in the Tunnel.  *Id.* at 96:13-18, 97:6-9.  Despite knowing about the violence ensuing there, Lee chose to move down to the Lower West Terrace and toward the Tunnel.

To get to the Tunnel, Lee walked over to the temporary bleachers set up on the Inaugural Stage.  As shown in Image 7, by now, Lee had pulled a Maryland flag neck gaiter over the bottom half of his face.



*Image 7:  Lee on the temporary bleachers wearing a Maryland flag neck gaiter (Ex. 508B)*

Lee then moved down from the bleachers to the Lower West Terrace and pushed through the mob to get closer to the Tunnel.



*Image 8:  Lee (yellow circle) on the Lower West Terrace.  The Tunnel is under the archway on the righthand side of the image (Ex. 510 at 21 seconds)*

At approximately 4:46 p.m., Lee moved to the steps just below the Tunnel entrance, and as other rioters pushed into officers' shields and assaulted them, Lee lit a smoke bomb and hurled it at the police line.  As shown below in Image 9, upon ignition the smoke bomb shot flames out from two sides and sent sparks flying.  The smoke bomb struck MPD Officer J.S.'s shield, causing him to lose his footing, then spewed smoke in Officer J.S.'s face and throughout the Tunnel.  Not only did Officer J.S. feel the physical impact of the smoke bomb hitting his shield, but by disbursing smoke, the smoke bomb hindered Officer J.S.'s vision and the vision of the other officers in the Tunnel, impeding their ability to defend themselves from other rioters' assaults.



*Image 9: Lee holding the smoke bomb after he initiated it, as sparks shoot out from the bomb (Ex. 511 at 2:23)*



*Image 10: Body Worn Camera footage from MPD Officer J.S. showing Lee's smoke bomb striking his shield (Ex. 600 at 1:44)*

Lee testified that he had seen smoke bombs used at other protests he attended in the past, and knew what would happen once he threw it, but still intentionally threw the smoke bomb at the police line. *Id.* at 72:9-12, 74:7-9. Lee did so because he said he felt ire towards the officers and wanted to "make a statement" and "make his voice heard" since he had "had enough" of the police being violent toward rioters. *Id.* at 65:6-7; 72:20-21; 73:6-7, 13, 18-19; 75:16-17. Lee believed that police were acting outside of their "moral bounds" by using unnecessary force, and that police were the cause of violence on January 6. *Id.* at 59:18-64:25. After he threw the smoke bomb, Lee

thought his actions made a difference, which he described as being "pretty good," even though his smoke bomb put police officers in danger. *Id.* at 76:10-12.



*Image 11:  Lee (bottom yellow circle) throwing the smoke bomb (top yellow circle) at the police line (Ex. 803)*

After throwing the smoke bomb, Lee threw three additional objects the police.  Lee said he did so because he wanted to "have the same effect" on officers that he did when he hurled his smoke bomb. *Id.* at 76:16-23.  These objects not only posed a physical risk to officers, but objects thrown into the Tunnel also distracted officers and impacted their ability to defend themselves.  As Lee threw these objects, rioters continued to assault the police line, including one rioter who hit an officer's shield multiple times with a baseball bat.



*Image 12:  Lee (bottom yellow circle) throwing an unknown object (top yellow circle) at the police line in the Tunnel (Ex. 513B)*

Once Lee was done throwing objects at the police line, he pulled out the flashlight he had brought with him, and light-checked the police.  "Light checking" is the act of shining a light in someone's face to blind and distract them.  In this case, light checking officers impeded their ability to defend themselves from other rioters' assaults.



*Figure 1: Lee (yellow circle) holding up a flashlight and light checking police officers (Ex. 514 at 1:03)*

After light checking the officers, Lee claimed that he left the Lower West Terrace in response to tear gas being disbursed by police, even though tear gas had already been sprayed in his direction prior to the light checking.

Lee's False Statements at Trial

Lee's testimony during his trial included multiple material falsehoods.  At multiple points, Lee falsely blamed police for the violence which occurred on January 6.  *See, e.g.*, *id*. at 60:4-64-14; 94:18-20.  He testified that police officers on January 6 used excessive force, far beyond what he termed as their moral bounds.  *Id.* at 64:19-25.  And according to Lee, the improper actions of law enforcement drew the ire of rioters causing them to react in kind.  *Id.* at 65:1-5.  In reality, the officers conducted themselves heroically, and with proper reservation.

As to his specific actions, Lee falsely testified at trial that:

- He did not know the Capitol grounds were closed and instead thought a scheduled event may be occurring there.  *Id.* at 19: 20-22.  Lee said this despite encountering intact snow fencing bearing Area Closed signs, helping other rioters climb over a wall and break through the snow fencing, and then carrying around an Area Closed sign with him.

- He did not aim the smoke bomb at police when he threw it, and only threw the smoke bomb to make his voice heard.  *Id.* at 73:5-19; 75:7-15.  Lee later contradicted his own testimony by admitting during cross examination that he knowingly threw the smoke bomb at police officers.  *Id.* at 100:19-21.

- The three unknown objects he threw were very small, one-ounce objects, similar to pads placed on the bottom of furniture.  *Id.* at 77:6-15.  However, open-source video showed these objects to be spherical and larger than a single ounce.

- He only shined a light toward the police line to illuminate the scene since it was getting dark out. *Id.* at 80:16-20. Lee said this even though the Tunnel had overhead lights on, it was not dark out yet, and Lee's flashlight was shined at officers, not in a manner of trying to illuminate the crowd.

During the verdict, this Court found that Lee shaded his testimony to give post-hoc justifications for his actions, Aug. 23, 2024 Trial Tr. at 4:5-6, and did not credit Lee's testimony that: he only threw the smoke bomb to make a statement, *id.* at 6:3-5, 12-16; that the smoke bomb and three unknown objects Lee threw were light in weight, *id.* at 7:18-23; and that Lee shone the flashlight at officers to illuminate the area, *id.* at 8:18-19.

### III.    THE CHARGES

On October 18, 2023, a federal grand jury returned an indictment charging Lee with seven counts, including, Obstructing, Impeding, or Interfering with Law Enforcement During a Civil Disorder, in violation of 18 U.S.C. § 231(a)(3); Assaulting, Resisting, or Impeding Certain Officers, in violation of 18 U.S.C. § 111(a)(1); Entering and Remaining in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(1); Disorderly and Disruptive Conduct in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(2); and Disorderly and Disruptive Conduct in a Capitol Building or Grounds, in violation of 40 U.S.C. § 5104(e)(2)(D). On, August 23, 2024, Lee was convicted of these five offenses following a bench trial.

### IV.    STATUTORY PENALTIES

Lee now faces sentencing on the five offenses of conviction listed above.

As noted by the Presentence Report ("PSR") issued by the U.S. Probation Office, the defendant faces the following maximum penalties on each count of conviction:

- 18 U.S.C. § 231(a)(3) carries a maximum sentence of five years of imprisonment, a term

of supervised release of three years pursuant to 18 U.S.C. § 3583(b)(2), a fine of $250,000 pursuant to 18 U.S.C. § 3571(b)(3), restitution, and a mandatory special assessment of $100.

- 18 U.S.C. § 111(a)(1) carries a maximum sentence of eight years of imprisonment, a term of supervised release of three years pursuant to 18 U.S.C. § 3583(b)(2), a fine of $250,000 pursuant to 18 U.S.C. § 3571(b)(3), restitution, and a mandatory special assessment of $100.

- 18 U.S.C. §§ 1752(a)(1) and (a)(2) each carry a maximum sentence of one year of imprisonment, a term of supervised release of one year pursuant to 18 U.S.C. § 3583(b)(3), a fine up to $100,000 pursuant to 18 U.S.C. § 3571(b)(5), restitution, and a mandatory special assessment of $25.

- 40 U.S.C. § 5104(e)(2)(D) carries a maximum sentence of six months of imprisonment, a fine of $5,000 pursuant to 18 U.S.C. § 3571(b)(6), and a mandatory special assessment of $10.

## V.    THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). The government agrees with the Guidelines calculation set forth in the PSR. *See* PSR ¶¶ 30-66.[2]

---

[2] Guidelines Sections 1B1.1(a)(1)-(3) describe the steps a sentencing court must follow to determine the Guidelines range, which include determining the applicable Guideline, determining the base offense level, applying appropriate special offense characteristics, and applying any applicable Chapter 3 adjustments. Under U.S.S.G. § 1B1.1(a)(4), the applicable Guidelines analysis as set out in U.S.S.G. § 1B1.1(a)(1)-(3) must be "repeat[ed]" for "each count." Only after the Guidelines analysis as set out in U.S.S.G. § 1B1.1(a)(1)-(3) is performed, is it appropriate to "[a]pply" the grouping analysis as set out in Chapter 3. The revised PSR does not follow these steps. It concludes

During the presentencing process, the government initially did not identify the dangerous weapon enhancement as an applicable enhancement. But upon review of the guidelines, the case law, and facts as presented, the government concurs with Probation's application of §2A2.2(b)(2)(B) for the reasons set below.

Because a dangerous weapon was "otherwise used" (Lee lit a smoke bomb, which spewed out flames and smoke, and hurled it at the police line), four levels should be added.  U.S.S.G. § 2A2.2(b)(2)(B).  A "'dangerous weapon' has the meaning given that term in §1B1.1, Application Note 1 . . .." *Id.* Application Note 1. Under U.S.S.G. § 1B1.1, "dangerous weapon" means either "an instrument capable of causing death or serious bodily injury," or "an object that is not an instrument capable of inflicting death or serious bodily injury *but (I) closely resembles such an instrument*; or *(II) the defendant used the object in a manner that created the impression that the object was such an instrument*." (emphasis added).

Here, the dangerous-weapon definition is met in two ways. First, given the flames and smoke emanating from the smoke bomb as it was thrown at officers, the smoke bomb closely resembled an explosive device that is capable of causing death or serious bodily injury. U.S.S.G. § 1B1.1, Application Note 1(E)(ii)(I); *United States v. Rodriguez*, 301 F.3d 666, 669 (6th Cir. 2002) (dangerous-weapon enhancement properly applied where defendant carried small Styrofoam box that "could have been reasonably regarded as a dangerous weapon, namely, a bomb"); *United States v. Woodard*, 24 F.3d 872, 874 (6th Cir. 1994) (toy gun warranted dangerous-weapon enhancement where "[e]ven if the [bank] tellers were close enough to recognize that the gun was a toy gun, a police officer, for example, who was stationed in the bank,

_____

that Counts One and Two group and Counts Three and Four group—a conclusion with which the government agrees—but does not set forth the Guidelines calculation separated for each count as required under U.S.S.G. § 1B1.1(a)(4).  PSR ¶¶ 30-66.

would be far enough away to perceive the toy silver revolver as a dangerous weapon that could engender a violent response"). Second, by throwing a flaming and smoking object at the police line, Lee used the smoke bomb "in a manner that created the impression that the object was" capable of causing death serious bodily injury. *Id.* Application Note 1(E)(ii)(II).

By cross-reference from U.S.S.G. § 2A2.4(c), the guideline directs that § 2A2.2 (Aggravated Assault) be applied if the conduct constituted aggravated assault. "Aggravated assault" includes any felonious assault that involved "an intent to commit another felony." § 2A2.2 cmt n.1. In determining whether the offense conduct constituted "aggravated assault," this Court "shall" determine the conduct based on, "all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant." U.S.S.G. § 1B1.3(a)(1)(A).   Additionally, in any "jointly undertaken criminal activity," "all acts and omissions of others that were . . . (iii) reasonably foreseeable in connection with that criminal activity . . . ." U.S.S.G. §1B1.3(a)(1)(B)(iii).

Here, Lee directly aided the violent assaults on the police line at the mouth of the tunnel, and he did so with the intent to commit another felony—that is, obstructing, impeding, or interfering with law enforcement officers in violation of 18 U.S.C. § 231(a)(3). Thus, Probation's Guidelines analysis is correct. That Guidelines analysis is thus:

Count One: 18 U.S.C. 231(a)(3)

| U.S.S.G. § 2A2.2(a) [3] | Base Offense Level | 14 |
|---|---|---|
| U.S.S.G. § 2A2(b)(2)(B) | Use of a Dangerous Weapon | +4 |
| U.S.S.G. § 3A1.2(a)-(c) | Official Victim | +6 |
| U.S.S.G. § 3C1.1 | Obstruction | +2 |
| | **Total** | **26** |

---

[3] By cross-reference from U.S.S.G. § 2A2.4(c), which directs that § 2A2.2 (Aggravated Assault) be applied if the conduct constituted aggravated assault.

Count Two: 18 U.S.C. § 111(a)(1)

| U.S.S.G. § 2A2.2(a) | Base Offense Level | 14 |
| U.S.S.G. § 2A2.2(b)(2)(B) | Use of a Dangerous Weapon | +4 |
| U.S.S.G. § 3A1.2(a)-(c) | Official Victim | +6 |
| U.S.S.G. § 3C1.1 | Obstruction | +2 |
| | **Total** | **26** |

Count Three: 18 U.S.C. § 1752(a)(1)

| U.S.S.G. § 2B2.3(c)(1)[4] | Intent to Commit Another Felony | 14 |
| U.S.S.G. § 3C1.1 | Obstruction | +2 |
| | **Total** | **16** |

Count Four: 18 U.S.C. § 1752(a)(2)

| U.S.S.G. § 2A2.2(a)[5] | Aggravated Assault | 14 |
| U.S.S.G. § 3C1.1 | Obstruction | +2 |
| | **Total** | **16** |

Count Six: 40 U.S.C. § 5104(e)(2)(D)

As a Class B misdemeanor, the Guidelines do not apply.  U.S.S.G. § 1B1.9.

Grouping Analysis:

Under U.S.S.G. § 3D1.2, "closely related counts" group. Lee's four counts of conviction form two groups:

Group One: Counts One and Two group because they involve the same victims—officers in the Tunnel and specifically, Officer J.S. The offense level for this group is 26.

Group Two: Counts Three and Four group because they involve the same victim—Congress—and similar acts "connected by a common criminal objective," that is,' to stop the certification of the Electoral College vote. U.S.S.G. § 3D1.2. The offense level for this group is 16.

---

[4] By cross-reference from U.S.S.G. § 2B2.3(c)(1) (Trespass), which directs that § 2X1.1 (Attempt, Solicitation, or Conspiracy) be applied if the resulting offense level is greater than that determined by § 2B2.3(a)–(b) (a total offense level of 6).

[5] By cross-reference from U.S.S.G. § 2A2.4(c)(1) (Obstructing or Impeding Officers), which directs that Section § 2A2.2 (Aggravated Assault) be applied if the conduct constituted aggravated assault.

One unit is assigned to Group One because it is the group with the highest offense level. U.S.S.G. § 3D1.4(a). Group Two is disregarded because it is 10 levels less serious than Group One. U.S.S.G. § 3D1.4(c). Accordingly, the combined offense level is **26**.

**Combined Offense Level**      **26**

**Total Adjusted Offense Level:**      **26**

Recent amendments to the Sentencing Guidelines for 2023 include a new guideline, U.S.S.G. § 4C1.1, which provides for a two-level decrease in the offense level for offenders who have no criminal history points and who meet certain additional criteria. Section 4C1.1 does not apply in this case because Lee's conduct—throwing a smoke bomb and three other objects at police—was violent. Violence has been defined by this Court as "[t]he use of physical force," typically "accompanied by fury, vehemence, or outrage" and "unlawfully exercised with the intent to harm" or "the "exertion of any physical force so as to injure or abuse." *United States v. Bauer*, 21-cr-386-2 (TNM), ECF No. 195 at 4-5. The defendant's conduct easily satisfies this definition. At a minimum, Lee's conduct constituted a credible threat of violence. *See United States v. Bauer,* 21-cr-386 (TNM), ECF No. 195 at 6 (defining a credible threat of violence as "a believable expression of an intention to use physical force to inflict harm").

The U.S. Probation Office calculated the defendant's criminal history as category I, which is not disputed. PSR ¶ 69. Accordingly, based on the government's calculation of the defendant's total adjusted offense level at 26, Lee's Guidelines imprisonment range is 63-78 months' imprisonment.

## VI.    SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, on balance, the Section 3553(a) factors weigh in favor of a lengthy term of incarceration.

### A.    Nature and Circumstances of the Offense

As shown in Section II(B) of this memorandum, Lee's felonious conduct on January 6, 2021 was part of a massive riot that almost succeeded in preventing the certification vote from being carried out, frustrating the peaceful transition of Presidential power, and throwing the United States into a Constitutional crisis.  Lee participated in the initial breach of the West Front and helped other rioters climb over the Olmsted Wall and snow fencing.  He witnessed rioters assault officers on the West Plaza and in the Tunnel, but still chose to move up to the steps right below the Tunnel entrance and throw a smoke bomb and other objects at police. The nature and circumstances of Lee's offenses were of the utmost seriousness, and fully support the government's recommended sentence.

### B.    The History and Characteristics of the Defendant

Lee enjoyed a privileged upbringing.  He grew up in Rockville, MD with parents who have been married for over 30 years and enjoyed considerable professional success.  He earned a bachelor's degree from the University of Maryland.[6]  PSR ¶¶ 74-79, 90.  Lee's background shows that he had many other choices and opportunities in life than to commit the instant offense on January 6, 2021.  Lee's crime was not motivated by addiction or poverty.  Instead, Lee chose to participate in the riot at the United States Capitol because his preferred candidate lost an election. Lee's history and characteristics support the imposition of a sentence within his Guidelines' range.

---

[6] While the PSR notes that Lee was briefly employed as a Montgomery County Police Officer, Lee was not placed on suspension because of his conduct on January 6.  PSR ¶ 95.  Rather, Lee was suspended for a separate on-duty incident prior to his arrest for the crimes at issue here. Moreover, while the defendant may claim that his brief employment shows his support for law enforcement, his actions on January 6 and comments at trial blaming police officers for violence demonstrate the opposite.

### C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

As with the nature and circumstances of the offense, this factor supports a sentence of incarceration. Lee's criminal conduct on January 6 was the epitome of disrespect for the law.  *See United States v. Cronin*, 22-cr-233-ABJ, June 9, 2023 Sent. Hrg. Tr. at 20 ("We cannot ever act as if this was simply a political protest, simply an episode of trespassing in a federal building. What this was was an attack on our democracy itself and an attack on the singular aspect of democracy that makes America America, and that's the peaceful transfer of power.").

### D.    The Need for the Sentence to Afford Adequate Deterrence

#### *General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C. § 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[7] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

#### *Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs heavily in favor of a lengthy term of incarceration.  First, Lee knew that rioters were assaulting officers in the Tunnel, and he chose to participate in that violence.  To do so, he had to push through the mob on the scaffolding, bleachers, and lower west terrace, until he finally reached the steps below the Tunnel. Not only had Lee moved to where the violence was, but also changed his attire beforehand to better engage with that clear violence.  Then Lee chose to join by throwing

---

[7] *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

a smoke bomb that obstructed the vision of every officer at the front of the police line in the Tunnel, exposing them to danger. But throwing the smoke bomb was not enough for Lee; he proceeded to throw three other objects at officers. And when he was finished throwing objects, he light checked police, attempting to obscure their vision and expose them to assaults from his fellow rioters.

Second, while these actions are bad enough in isolation, Lee attempted to justify them through blatant misrepresentations. He downplayed the nature and size of the objects he threw. He claimed he shined a flashlight at officers to try and "illuminate" the scene. Even worse, Lee blamed officers for the violence that occurred on January 6. Lee's claims show an extreme lack of remorse and are clear indicators that a Guidelines sentence is needed to afford specific deterrence. Lying under oath in this context is plainly corrosive to the criminal justice system and its intent to seek facts and truth.

### E.    The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up). Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

21

### F.      Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar *conduct*" (emphasis added). So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007).

Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances."

*United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[8] "When an offense is uniquely serious, courts will consider the need to impose stiffer sentences that justify the risk of potential disparities." *United States v. Mattea*, 895 F.3d 762, 768–69 (D.C. Cir. 2018) (cleaned up).

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences.[9] While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the conduct in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

In *United States v. Palmer*, 21-cr-328 (TSC), similarly to Lee, Palmer assaulted officers in the Tunnel with a dangerous weapon. Palmer deployed the contents of a fire extinguisher directly into the Tunnel onto police officers, and then twice threw the fire extinguisher at officers. Palmer also threw other objects at the officers, including a wooden plank. Like Palmer, Lee similarly threw dangerous objects into the tunnel at officers. For assaulting police officers with a dangerous weapon, Palmer was sentenced to 63 months' imprisonment following his guilty plea to violating 18 U.S.C. § 111(a) and (b). Here, however, Lee's object was a form of an incendiary device, and to boot, he contested these facts at trial, lying under oath to this Court. This merits additional consideration and punishment.

---

[8] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

[9] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

This Court has also had multiple defendants convicted for criminal conduct in and around the Tunnel, and of those, *United States v. Judd*, 21-cr-40 (TNM) may provide the closest comparator. Judd entered the Tunnel at approximately 2:56 p.m., and encouraged other rioters to enter with him, just as Lee encouraged rioters to breach the restricted perimeter with him. As Judd moved into the Tunnel, he engaged in a heave-ho with fellow rioters, then moved back outside of the Tunnel where he continued to relay commands and encouragement to fellow rioters, including passing forward police riot shields to rioters in the Tunnel. At approximately 3:12 p.m., Judd went back into the Tunnel and lit something, which sparked like Lee's smoke bomb. Judd then threw it at officers. Unlike Lee's smoke bomb, though, the object did not ignite or have any readily impact upon the officers or other rioters. But in the present case, the device thrown by Lee did. It can be readily identified as a type of incendiary device.

Following a stipulated trial, Judd was found guilty of violating 18 U.S.C. §§ 111(a)(1) and 1512(c)(2). Unlike Lee, Judd accepted responsibility for his actions and did not testify falsely at trial. Judd was sentenced to 32 months' imprisonment. Additionally, Judd did not throw additional objects or continue his conduct through "light checking" officers. Given Lee's enhanced conduct, his current guidelines range, his lack of remorse, his lack of acceptance, and his lies to this Court, he merits additional incarceration.

In *United States v. Vincent Gillespie*, 22-cr-60 (BAH), following a jury trial, the defendant was convicted of violations of 18 U.S.C. §§ 111(a)(1) and 231(a)(3). Much like Lee, Gillespie made his way through the crowd to engage in violence at the Tunnel. Once at the Tunnel, Gillespie restrained the arms of a MPD officer, preventing the officer from fending off the attacks from others. Additionally, Gillespie pulled the officer toward the crowd and used a riot shield to ram

into the line of the officers while at the Tunnel but also used the shield defensively. Gillespie was sentenced to serve 68 months incarceration.

Like in *Gillespie*, the total offense level here is 26 and the conduct is similar. Instead of holding an officer's arms, Lee covered an officer's eyes, but the result was the same: Officers' defenses were hindered. During some of the most violent conduct on January 6, 2021, both Gillespie and Lee limited officers' ability to defend themselves. Gillespie similarly did not accept responsibility.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095.

## VII.  RESTITUTION

Under 18 U.S.C. § 3556, a sentencing court must determine whether and how to impose restitution in a federal criminal case. Because a federal court possesses no "inherent authority to order restitution," *United States v. Fair*, 699 F.3d 508, 512 (D.C. Cir. 2012), it can impose restitution only when authorized by statute, *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C.

Cir. 2011). First, the Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *Papagno*, 639 F.3d at 1096; *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA). Second, the Mandatory Victims Restitution Act ("MVRA"), Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA. *Papagno*, 639 F.3d at 1096. The MVRA applies to certain offenses including those "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss," 18 U.S.C. § 3663A(c)(1)(B), a "crime of violence," § 3663A(c)(1)(A)(i), or "an offense against property … including any offense committed by fraud or deceit," § 3663A(c)(1)(A)(ii). *See Fair*, 699 F.3d at 512 (citation omitted).

The applicable procedures for restitution orders issued and enforced under these two statutes is found in 18 U.S.C. § 3664. *See* 18 U.S.C. § 3556 (directing that sentencing court "shall" impose restitution under the MVRA, "may" impose restitution under the VWPA, and "shall" use the procedures set out in Section 3664).

Both [t]he VWPA and MVRA require identification of a victim, defined in both statutes as "a person directly and proximately harmed as a result of" the offense of conviction. *Hughey v. United States*, 495 U.S. 411, 418 (1990) (interpreting the VWPA). Both statutes identify similar covered costs, including lost property and certain expenses of recovering from bodily injury. *See Papagno*, 639 F.3d at 1097-97; 18 U.S.C. §§ 3663(b), 3663A(b). Finally, under both the statutes, the government bears the burden by a preponderance of the evidence to establish the amount of loss suffered by the victim. *United States v. Bikundi*, 926 F.3d 761, 791 (D.C. Cir. 2019).

In deciding whether to impose restitution under the VWPA, the sentencing court must take account of the victim's losses, the defendant's financial resources, and "such other factors as the court deems appropriate." *United States v. Williams*, 353 F. Supp. 3d 14, 23-24 (D.D.C. 2019) (quoting 18 U.S.C. § 3663(a)(1)(B)(i)). The MVRA, by contrast, requires imposition of full restitution without respect to a defendant's ability to pay.[10]

Because the defendant in this case engaged in criminal conduct in tandem with hundreds of other defendants charged in other January 6 cases, and his criminal conduct was a "proximate cause" of the victims' losses if not a "cause in fact," the Court has discretion to apportion restitution and hold the defendant responsible for his individual contribution to the victims' total losses. *See Paroline v. United States*, 572 U.S. 434, 458 (2014) (holding that in aggregate causation cases, the sentencing court "should order restitution in an amount that comports with the defendant's relative role in the causal process that underlies the victim's general losses"). *See also United States v. Monzel*, 930 F.3d 470, 476-77, 485 (D.C. Cir. 2019) (affirming $7,500 in restitution toward more than a $3 million total loss, against a defendant who possessed a single pornographic image of the child victim; the restitution amount was reasonable even though the "government was unable to offer anything more than 'speculation' as to [the defendant's] individual causal contribution to [the victim's] harm"; the sentencing court was not required to "show[] every step of its homework," or generate a "formulaic computation," but simply make a "reasoned judgment.").

More specifically, the Court should require Lee to pay $2,000 in restitution for his convictions on Counts One and Two. This amount fairly reflects Lee's role in the offense and the damages resulting from his conduct. Moreover, in cases where the parties have entered into a

---

[10] Both statutes permit the sentencing court to decline to impose restitution where doing so will "complicat[e]" or "prolong[]" the sentencing process. *See* 18 U.S.C. §§ 3663(a)(1)(B)(ii), 3663A(c)(3)(B).

guilty plea agreement, two thousand dollars has consistently been the agreed upon amount of restitution and the amount of restitution imposed by judges of this Court where the defendant was not directly and personally involved in damaging property. Accordingly, such a restitution order avoids sentencing disparity.

## VIII.   FINE

The defendant's convictions subject him to a statutory maximum fine of $250,000 for Counts One and Two, $100,000 for Counts Three and Four, and $5,000 for Count Six.  *See* 18 U.S.C. § 3571(b).  In determining whether to impose a fine, the sentencing court should consider the defendant's income, earning capacity, and financial resources. *See* 18 U.S.C. § 3572(a)(1); \U.S.S.G. § 5E1.2(d).  The sentencing guidelines require a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine. U.S.S.G. § 5E1.2(a) (2023).  Here, the defendant's financial assets set forth in the PSR suggest that the defendant is unable, and is unlikely to become able, to pay a fine.  PSR ¶ 104.

## IX.    CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of 68 months of incarceration.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY

BY:     */s/ Matthew E. Vigeant*
MATTHEW E. VIGEANT
Assistant United States Attorney
D.C. Bar No. 144722
United States Attorney's Office
District of Columbia
601 D Street, NW 20530
(202) 252-2423
matthew.vigeant@usdoj.gov

*/s/ Adam M. Dreher*
ADAM M. DREHER
Assistant United States Attorney
Mich. Bar No. P79246
United States Attorney's Office
District of Columbia
601 D Street, NW 20530
(202) 252-1706
adam.dreher@usdoj.gov